John Sherwin DIERCKS, Appellee,

v.

Lynda DURHAM, Appellant,

Lynda Musgrove; James Wilde.

No. 91–2133.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 7, 1991.
Decided March 23, 1992.

Bruce Farmer, Jefferson City, Mo., argued (Gary L. Gardner, on the brief), for appellant.

Robert A. Wright, Jr., Des Moines, Iowa, argued, for appellee.

Before MCMILLIAN, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Lynda Durham, a former supervisor at the Algoa Correctional Center, appeals from a judgment in favor of John Sherwin Diercks on his action brought under 42 U.S.C. § 1983 (1988). This action arose out of prison disciplinary proceedings based on a charge that Diercks had bribed one of the prison corrections officers. Durham had ordered the officer to file a disciplinary charge against Diercks, and later acted as a member of the disciplinary review committee voting to discipline Diercks. Durham argues that (1) she is entitled to qualified immunity, and alternatively, that (2) we should reverse the award of $3,600 actual damages and remand for entry of $1.00 nominal damages. We affirm the judgment of the district court.[1]

Diercks was an inmate of the Algoa Correctional Center in Jefferson City, Missouri. He approached James Wilde, a corrections classification assistant, and told him that two inmates had asked Diercks to tell Wilde that the inmates had given urine specimens which would test positive for the presence of a controlled substance. If these specimens would be made to disappear, the inmates would furnish the names of other inmates whose urine, if specimens were taken, would test positive. Wilde's supervisor, Durham, learned of the conversation, and after waiting for three hours for Wilde to file a conduct violation against Diercks, directed Wilde to issue a conduct violation for bribery. Wilde told Durham that he could not do so because Diercks was his informant, or "snitch." Durham again instructed Wilde to write the conduct violation, which Wilde did, charging Diercks with bribery.

The next day a sergeant interviewed Diercks in the presence of Wilde to inform Diercks that a conduct violation had been filed against him. Diercks was surprised that he had been issued a violation. At this time Wilde told Diercks that Durham had ordered him to issue the conduct violation. The following day, the disciplinary team committee, consisting of Durham and two other officials, unanimously found Diercks guilty of the violation because he admitted the conversation with Wilde took place. The committee recommended nine days of disciplinary segregation, which included visiting and telephone restrictions, and referred Diercks to the classification committee for possible assignment to administrative segregation. That committee recommended that Diercks be assigned to the protective custody section of administrative segregation, where he remained for 30 days. Durham was not on this committee, but was present at the meeting, and had recommended certain sanctions for Diercks.

The trial testimony conflicted in some respects. Wilde said that during Diercks' initial interview Diercks told the sergeant that the conduct violation was true. Wilde testified that he understood Diercks to say that he would provide the names of the other inmates—not that Diercks was just a messenger for the other two inmates. Diercks testified that he admitted that the conversation with Wilde did, in fact, take place. But Diercks denied that he had told Wilde that if Wilde disposed of the two urine samples Diercks would give five or six names of other people that would test positive. Diercks explained to Wilde that he was basically conveying a message, as he was the only one who had "access upstairs" to the staff. The inmates had approached him and asked him to tell Wilde that they would furnish names. Diercks said that he told Wilde that he was prepared to return to the two inmates and bring back the other names.

1. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Diercks testified in detail about what he said at the disciplinary team meeting. No one recorded the meeting, but one of the committee members took notes. Diercks again admitted that the conversation with Wilde took place. He then elaborated on the things that had gone on in the past which led him to believe that this incident was normal behavior. He explained his relationship with the prison staff which had gone on for some time, and he did not think he was doing anything wrong because the relationship had existed for so long. He stated, "They had set a precedent where this was all right to do." Oftentimes he would ask Wilde not to "drop urines on certain people" that Diercks knew would test positive because they had asked him to do so. Diercks had often asked Wilde not to write up people or to search certain prisoners' cells, but only once, up to that time, had Diercks ask Wilde to actually dispose of a violation that had been written up. He made a particular reference to a conduct violation involving an inmate named Bolling, regarding a radio found in a prison cell. Up until then, Diercks had always only asked Wilde not to write up violations. Wilde admitted at trial that he had previously received from Diercks names of inmates whose urine specimens were likely to test positive for controlled substances. Wilde would usually include one of those names in his monthly allotment of supposedly randomly selected urine specimens.

Diercks detailed his relationship with Wilde and another official. Through these relationships Diercks helped with the inmates' payroll, reorganized the protective custody unit's filing system, and ordered supplies, all contrary to regulations. Diercks asserted that he "was able to steer them the way [he] wanted to go," and that he was "as close as an inmate could come to one of the staff upstairs." Durham testified that Diercks had referred to the two officials as "putty in my hands."

Durham testified that during the disciplinary violation hearing, Diercks admitted that the conversation with Wilde took place. When asked if Diercks said that he was communicating the message from two other inmates, she answered, "I don't recall that." Durham stated that the committee based its recommendation of guilty on the inmate's "own admission of guilt." When Durham was asked if Diercks told the committee that he had a relationship with James Wilde "wherein he discussed these kinds of matters before" with Wilde, she answered, "Not at that time that I remember." Durham testified that she had told Wilde at one time that she did not feel that he was randomly selecting inmates for urinalysis testing, but she did not recall what specific incident brought her to that conclusion.

Diercks testified that as a result of the disciplinary action he had 102 days of "dead time" in which he was not eligible for transfer to a prerelease center and honor center where he could have been earning money.

Durham filed motions for directed verdict at the close of plaintiff's evidence and at the close of all the evidence, both of which the district court denied. At the conclusion of all the evidence, the district court directed a verdict in favor of Wilde and another corrections officer. However, the court also directed a verdict in favor of Diercks and against Durham, finding that she had violated Diercks' due process rights. The court submitted the case to the jury to determine only damages and causation, instructing the jury that it must decide if Diercks was entitled to damages, and further: "You must then decide the amount of any damages you believe plaintiff sustained *as a direct result of the violation of his due process rights.*" (Emphasis added). The jury returned a verdict of $3,400 in nominal damages and of $3,600 in actual damages. Durham filed a motion under Federal Rule of Civil Procedure Rule 50(b) for judgment notwithstanding the verdict.[2] The district court denied the mo-

---

2. In her j.n.o.v. motion, Durham asked the court, in the alternative, to "reduce the awards of actual damages of $3,600.00 and nominal

damages of $3,400.00 against defendant Durham to nominal damages of $1.00 or, in the further alternative, to reduce the award of nom-

tion, but did grant Durham's alternative motion to reduce the nominal damage award to $1.00. This appeal followed.

### I.

■ Durham first argues that she is entitled to qualified immunity. We reject this argument. A defendant is not entitled to qualified immunity if: (1) her conduct violated a constitutional right clearly established before the conduct occurred; (2) she knew or should have known of the clearly established right when the conduct occurred; and (3) she knew or should have known that her conduct violated the plaintiff's right. *Brown v. Frey,* 889 F.2d 159, 165 (8th Cir.1989), *cert. denied,* 493 U.S. 1088, 110 S.Ct. 1156, 107 L.Ed.2d 1059 (1990). *See generally Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). At the time of this instance in July 1988, the law was clearly established that a charging officer should not sit in judgment on her own complaint in disciplinary proceedings. *Finney v. Arkansas Bd. of Corrections,* 505 F.2d 194, 208 (8th Cir.1974). *Finney* was based on the holding in *Morissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that a parole officer "directly involved in making recommendations [regarding parole] cannot always have complete objectivity in evaluating them." *Id.* at 486, 92 S.Ct. at 2602 (footnote omitted).

■ Durham argues that she was not the one who wrote the conduct violation, but only directed a subordinate to do so. We entertain no doubt, however, that Durham was not only "directly involved" in recommending that Diercks be charged with a conduct violation, but effectively commenced the charges against Diercks by ordering Wilde to write the conduct violation report. It is significant that Wilde hesitated in writing the report because Diercks was his informant, and that Durham had to instruct Wilde a second time to write the violation.

■ Additionally, at the time of this incident, the Algoa disciplinary procedures provided that any staff member actively involved in conducting an investigation was not allowed to sit as a member of the disciplinary committee. The evidence revealed that Durham questioned Wilde about his conversation with Diercks and his failure to file a conduct violation, and thus was investigating Diercks' conduct in doing so. We have no hesitation in concluding that the law was clearly established at the time of this occurrence, that Durham knew or should have known about the law, and that she was aware that she violated Diercks' due process rights through her conduct. Durham is not entitled to qualified immunity.

### II.

■ Durham argues that we should reduce Diercks' award of $3,600 in actual damages to $1.00. She claims that Diercks' "admission of guilt of the conduct violation," rather than the due process violation, caused his damages. She thus asks us to set aside the jury's finding that Diercks sustained actual damages as a direct result of the violation of his constitutional rights. The problem with Durham's argument is that it raises an issue not properly before us on appeal.

Durham's motions for directed verdict at trial sought judgment as a matter of law on the ground that Diercks' admission "obviated any risk of arbitrary decisionmaking." In this court, however, Durham does not seek judgment as a matter of law, as she does not contest the district court's ruling that she committed a due process violation. Rather, she asks for a reduction of the actual damages to nominal damages because Diercks' admission "obviated any risk of arbitrary decisionmaking *and severed the causal connection between the supervisory prison official's sitting in judgment and the actual damages suffered by the inmate.*" [3] (Emphasis added).

inal damages of $3,400.00 against defendant Durham to nominal damages of $1.00."

3. The language in both of Durham's motions for directed verdict was identical:

The emphasized language above was not contained in the motions for directed verdict. Thus, Durham has presented substantially different issues at trial and on appeal. The district court faced the issue of whether Durham was entitled to judgment as a matter of law, which would require a finding of no damages, either actual or nominal. We are faced with the issue of whether the actual damages award should be reduced to nominal damages based on lack of causation.[4]

Thus, Durham asks that we enter judgment in her favor on causation, which is a different type of relief than what was sought during trial in the district court.[5] We have held that a court may not enter a judgment notwithstanding the verdict on grounds other than those asserted in the motion for directed verdict. *Johnson v. Rogers*, 621 F.2d 300, 305 (8th Cir.1980); *Ralston Purina Co. v. Parsons Feed & Farm Supply*, 364 F.2d 57 (8th Cir.1966). *See also* 9 Charles A. Wright & Arthur A. Miller, *Federal Practice & Procedure* § 2537 n. 37 (1971 & Supp.1991). We have also held that a party's failure to move for a directed verdict for a specific reason precludes him from both moving for a j.n.o.v., and from raising the issue on appeal. *Hubbard v. White*, 755 F.2d 692, 695–96 (8th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985). Because Durham presents a new argument on appeal that she did not raise in her motions for directed verdict, we will not consider it.

While we do not reach the factual argument Diercks asserts regarding causation, it is not inappropriate to observe that she has essentially asked us to substitute our

judgment for the jury's on the issue of admission of guilt about which there is a conflict of testimony.

We affirm the district court's judgment.

---

Because plaintiff admitted to the disciplinary committee that he committed the conduct with which he was charged, defendant Durham's presence on the disciplinary committee did not create any hazard of arbitrary decisionmaking.

4. Certainly, this could be a valid argument. *See Carey v. Piphus*, 435 U.S. 247, 263–64, 266, 98 S.Ct. 1042, 1052–53, 1054, 55 L.Ed.2d 252 (1978) (a defendant who commits a due process violation is liable only for nominal damages if the plaintiff either suffered no actual damages or is unable to prove that his damages were caused by the violation); *Graham v. Baughman*, 772

F.2d 441, 446 (8th Cir.1985) ("In order for a plaintiff in a § 1983 action to be entitled to compensatory damages for a violation of procedural due process, he must prove that the violation actually was the cause of his injury or deprivation."). Durham failed to assert such an argument at the district court level, which precludes us from considering it on appeal.

5. Durham did ask the district court to reduce Diercks' actual damage award to $1.00 as an alternative request in her j.n.o.v. motion. However, she stated no specific grounds for such relief.